DIGITAL-VENDING v. UNIV OF PHOENIX DBSI Good morning, Your Honor. May it please the Court, my name is Drew DeNovo. I represent DBSI in this appeal. The summary judgment that this Court has asked to review is based on an erroneous claim construction that ignored key differences between the claims of DBSI's patents, as well as the core teaching of the claim conventions. As we proceed today, there are two general categories of claims that we are prepared to address. First, with respect to the 014 and 664 patent, those patents claim a three-tier architecture, including a registration server that is free of content managed by the architecture. The second set of claims, claims 1 through 22 of the 573 patent, do not include that express limitation and instead apply an alternative method of securing the valuable digital content. In either case, we contend that the summary judgment stands or falls based on the viability of the District Court's claim construction. I'm sure that your colleague is going to mention in a minute that there was a prosecution history that listed as a distinguishing feature as one of four arguments that the registration server was free of managed content. Is that a disavowal? Do you think of the... Is that a requirement that the registration server has to be free of managed content? Well, first of all, with respect to the 573 patent claims 1 through 22, claims 13 through 22 don't recite a registration server. They recite a registered user. Second of all, no. What happened in prosecution history is that the applicant made a general version or statement that all of the arguments that had been said with respect to the 014 patent applied here and then made specific arguments relative to the claims 1 through 22. Now, at the same time, the applicant stressed during prosecution that the claims were very different and specifically said that the claims were significantly different in a March 24, 2000 response to office action. The applicant pointed out that the reason they were significantly different was the addition of this critical portion limitation, which was absent in the claims of the 014, and the examiner acknowledged this. In its office action at A3595, the examiner noted after an election and restriction requirement, the examiner noted that claims 1 through 22 were drawn to a preregistered user. In other words— You stipulated to the definition of registered user. There's a stipulation, and then you try to get the district court to go back and let you eke out of that stipulation, and he said, no, too far down the road at this point, you're bound by your own stipulation. We stipulated prior to the court's erroneous construction of registration server. So we did not tender a construction of registration server that required it be free of content managed by the architecture. The court drew its own conclusion, and at that point, we did move for what we called clarification. The court said it was a motion for reconsideration, and we asked the court, put the court on notice, put University of Phoenix on notice, that we did not consider those limitations present in those claims. Make sure I have your timing right. You didn't even object until after summary judgment breaks, correct? You did not object to your stipulation to try and withdraw it until after all the summary judgment briefing. When you saw what the effect of your stipulation was finally going to be, plain and simple in there, summary judgment is not infringement. The timing, you're correct about the timing. On the other hand, the absence of that element or limitation was not material to the discovery at that point. The key issue here is registration server. So can we flip to that? Yes, of course. Judge Rader asked you, Chief Judge Rader asked you a question about whether or not there's disclaimer in the prosecution history. I'd like to focus on whether there's disclaimer in the patent itself. All right. Because a clear and unmistakable disavow would give other than ordinary meaning to a claim language. So why don't we start on column 9, lines 10 through 15, and tell me that seems to me their very best argument of disclaimer as they put it forth in the specification. So I'd like your thoughts on why that doesn't amount to a disclaimer. You're referring to the L1-4 patent on A7? 573. 573 patent, column 9, line 10 through 15. A given computer may host several content servers or it may host several registration servers, but a content server and a registration server may not reside on the same computer because that would violate the requirement that registration servers cannot contain courseware. But that's in the architecture section, right, not the methods section. It is. And importantly, this is in reference to figure 1, which is in fact the architecture claims have the same requirement. So you're just defining the requirement in the architecture claims that it has to be free of managed content, right? Agreed, Your Honor. But you don't make that same statement anywhere with respect to method claims, do you? We don't. And I think it's also important to note that that's in respect to the three-tier architecture that's depicted in figure 1. Figure 2 depicts a two-tier architecture, and there's substantial discussion about this in the specification immediately following the passage cited by Your Honor, Judge Moore, which is directed to a network of content servers and clients. So, of course, claim construction begins and ends with the claims, and the claims have very distinct differences here in terms of lacking the language about a further characterization of being free of content managed by the architecture. But unlike, for example, in the Arlington Industries case where there was only one set of figures disclosed and they all showed the same embodiment and the specification did not have an alternative embodiment, that is not present in this case. This case is stronger than Arlington Industries. What about column 13, line 35 to 37 on the discussion of the content server, figure 4 and figure 2, where it says, Unlike the registration server, the content server contains courseware and other managed content. Now, this isn't limited to the architecture, and it's pointing exactly to the figures you just cited to me. Well, again, with respect to the network of content servers and clients, the specification is clear that that network, that two-tier architecture, may or may not be associated with the registration server. So that's explicit in the specification. Unlike the registration server, the content server contains courseware. I mean, isn't that pretty much clearly saying the registration server can't and doesn't? In that embodiment, but also the specification says elsewhere that a registration server may not be attached to the content server or to the client. Give us that slide, would you please? One moment. It's A92. Oh, wait. Is it in the 5735? Yes, Your Honor. The column and line would be easiest for me. 10, 21 through 26. Column 10, 21. Along these same lines, you're off. I'm probably a little slow today. Explain to me what you think that this section means. You claim a registration server, so I'm finding it difficult to understand how this discussion that you might not need a registration server has any effect on what the definition of registration server should mean. Well, we did not claim a registration server in Claims 13 through 22. Okay, but we're still focusing on where you do claim a registration server, what that word should mean. I see. Well, there is no embodiment discussed in the specification of a registration server that has content on it except for certain varieties of content. So the specification does make clear that certain types of content may be present on the registration server. And so, for example, at A76, column 13, 6 to 10. You're not on the 573 patent anymore? You went on to a different one? Yes, unfortunately, it's probably very similar, but it's A76, a few pages before. You said column 13? Yes, sir. What lines? 6 through 10. 6 through 10. Which patent was it? The 014 patent? Yes, 014. Okay. 014, you said column? 13? Yes. Lines 6 through 10. And so this points out that the registration server can have content on it, just not content managed by the architecture. So, for example, it can have advertising, which, by the way, we submit is precisely the type of material on which the court based its summary judgment. It can also have inducements to web walkers, which we would submit a course catalog, and the text on a registration page could not be more clear examples of. Also, at A79, column 20, lines 49 through 51, the court, excuse me, the specification states that demonstration courseware may be present. Where was that? I'm sorry. It's column 20, line 49 through 51. And it says, to the extent a particular embodiment provides demonstration courseware, it may be charged to unregistered users. So it states that content may be provided to unregistered users via the registration server. Where does it say that's via the registration server? Well, it's presented to unregistered users. In that architecture, our understanding is that that would be provided via the registration server. Mr. De Novo, on the 573 patent, if you look at column 6 and 7, it talks about brief summary of the invention. This is before the discussion of the preferred embodiment. I don't see any reference in all of the text in column 6 to the registration server being provided. And it's only until we get to column 7, line 10, where it's talking about and then actually starting at the beginning of the paragraph on line 6. Again, the architecture provides improved security, efficiency, et cetera. For instance, additional security is provided by separating registration information from content. Et cetera. That suggests to me that the concept of separating registration from content is not, for lack of a better expression, an essential and required and necessary aspect of every feature of this invention. I couldn't agree more. And I think the Patent Office, based on the prosecution history, understood that when it had the restriction requirement. It understood that separation of the registration server from content was a security measure. The treatment of a critical portion was a security measure. And, in fact, claims 13 through 22 of the 573 patent are directed to a portion of a multi-level computer system, which we believe is consistent with the Patent Office's view that a pre-registered user is someone who can access the content. So your view is that the invention here encompasses a number of different aspects and that you have a range of claims covering various aspects and that the claims shouldn't be restricted to cover the separation of content in every single set of claims. That is correct, Your Honor. Is there anything else other than this one section of Column 7 that I've referred to that supports that position? Well, again, the position that a registration server need not be free of content managed by the architecture, it's our view that the statement in Columns 9 and 10, the general discussion along with Figures 2 and 6, that don't require any particular flavor or variety of registration server, makes clear that that component of the architecture is unnecessary in all embodiments. And the Patent Office understood that when they said that a pre-registered user is what's pertinent to the claims of the 573 patent. So I think it was understood in all aspects of the intrinsic record, as well as the claims, of course, which are paramount and which, in the Arlington Industries case, the Court recognized the important differences between those claims. Thank you. Mr. De Novo, Mr. Carter. Thank you, Your Honor. May it please the Court, we've been talking about registration server, and I'll get right to the point. Throughout, this is a common specification between all three patents. In the 573 patent, and I'll make reference to the 573 patent, at 538 through 40, as used here, and content includes both courseware and other digital… But the claims are what we're interpreting, of course. Yes, sir. Some claims have free of managed content, some do not. We acknowledge that difference, don't we? That's the basic teaching of our Phillips-on-Bonk case, is that where you have some cases with angled buffers and some without angled buffers, we acknowledge that the buffer need not be angled. But whereas here, where the whole, where the specification discusses… But it always makes a distinction between architecture and method. The architecture claims are littered with the discussion of free of managed content. You're right, I could find 20 instances. When you get to the method claims, there's a distinction. And then, as Judge Lynn pointed out, in discussing the summary of the entire invention, they were also quite careful to not put free of managed content, except in as an additional security feature, not as a feature of every single registration server, right? But as they pointed out to the patent office in response to the Sanyu reference, at least five times during that reference themselves, in response to the office action, they discussed the importance of the registration server being free of content managed by the architecture. There were four arguments they made in distinguishing that reference. One is that they didn't have a registration server at all. And another was that the registration server was not free of managed content. But to distinguish them based on four separate reasons, we can't pick one of those out and say that's the only reason, can we? Well, in this instance, Judge, where the essence of the discussion about the Sanyu reference was specifically to the fact that it did not have… A registration server at all. Free of content managed by the architecture. That was the point that they were… That was one of four points. And that was the critical point that covered all of the response to the reference and to the office action. In addition, Your Honor, the plaintiffs, DBSI, argued to Judge Friedman below, they argued that the definitions of the patents should cover all three patents. They didn't try to make a distinction between all three patents in their argument. Was there any distinction made either below or before us? I'm a little caught off guard, but between the architecture and the method. No, there was not. I don't remember anybody arguing at any point in time that registration systems should have one meaning in the context of a method claim and a totally different meaning in the context of an architecture claim. There was no argument… It had never been raised by anybody. Judge Moore, that is absolutely correct. There was never any distinction… Except in the claims themselves, right? You look at the claims themselves and they show the method claims know free of managed content. The architecture claims free of managed content. You look at the claims. But even the patentee who was looking at the claims and expressing to Judge Friedman the importance of their patented invention, they didn't distinguish between the terms that they submitted to the court and argued to Judge Friedman himself that all of the terms should be the same. Well, but see, that makes sense too. Registration server should have the same meaning for all the claims and free of managed content should have the same meaning wherever it's used. The problem is it's only used in some of the claims. It's not used in all of the claims. Registration server means the same for everything and registration server free of managed content means the same for every place it's used. And where it's not used, we presume there's a meaningful distinction there. But the meaningful distinction was not even brought up by the patentee. They don't have to. It's in the claims. They didn't even argue that to Judge Friedman. You don't have to argue it in the claims. The claims is on its face obvious. It's not obvious. If you review the specification, you review the facts as a whole. Yes, you do. And I did with clarity to find out that the architecture claims consistently contain the free of managed content language. The method claims do not. And when they go to the description of the whole invention, you heard Judge Lynn point out the free of managed content is only additional security feature. And they point to Figure 2 in support of their argument. And the specification states in Patent 573, Column 7, 3031, that Figure 2 is a diagram, further illustration, a portion of the network architecture of Figure 1, including a content server and several clients. There is a registration server that is free of content managed by the architecture, and that term spans all three patents. Mr. Carter, if registration server means, in all cases, a registration server free of content, doesn't that make the explicit language in Claim 23 superfluous? No, sir, it doesn't because No, sir? No, sir, because it's an apparatus claim. And in reading the patents and the specification and the prosecution history, it's clear that the registration server was simply used as a shorthand version in the 573 patent to refer to the only registration server that was disclosed. And that was one free of content. That language would be superfluous in the context of definition of a registration server. In the Curtis right, you and I are talking, I misunderstood your question, in that context with Claim 23. And this goes right to the Curtis right. But that's not the way. Yes, it's superfluous, but disclaimer trumps claim differentiation. And we're not talking about disclaimer or claim Yes or no. Yes. Is your answer to Judge Lynn, yes, it's superfluous. It's superfluous in Claim 23. Curtis right, Edwards Life Sciences addresses those issues. Phillips said this specifically. When you say steel baffles, we said in our opinion, that means baffles are not inherently made of steel. You had to define that this particular baffle is made of steel. Registration server. This particular one is free of managed content. Not everyone. And that's why you put the additional language in. Steel baffles show that baffles are not always made of steel. Registration server free of managed content means that registration servers are not always free of managed content. Or you wouldn't have to even put the language in there. That's what we said in Phillips. That's a non-bonk opinion. And in this case, Judge, looking at the specification, the description, the prosecution history as a whole, you can come to a different conclusion because it is not claim differentiation we're talking about. It's examining the term of the patent in the context of what the claim specification is. And you haven't showed me any place other than in architecture claims where they use that term. They did not disavow it. They were very careful to use method claims different than architecture claims. Figures six and seven show the same thing. A distinction. But in this instance, Judge, where there's claim differentiation is simply a rule of thumb and where it does not trump the clear import of the specification. And here, in this case, the specification, the prosecution history, and even Judge Friedman's five-page analysis, painstaking analysis below, reflects exactly where we are here. Why does the specification trump the clear language of the claims? Because you see, we're searching for meaning and the meaning is derived from the context in which it finds itself in the specification. I understand that. And that's where we are. I mean, you have to derive meaning from the specification. You have to derive meaning of what we're dealing with. With this common specification, this being the only method patent understood, in this common specification covering the complete invention, that's what was described. What is your reaction to the comment I made earlier that the specification seems to indicate to me that this invention had a number of different features? Isn't the patentee entitled to claim different features and different sets of claims without having the claims burdened with every feature? The patentee can use different terms to describe the exact same thing. Steel baffles and iron baffles and all different kinds of baffles. And registration servers. And registration servers free of managed content. And content servers and whatever. And he can describe that. But here where the language in the patents and citing chapter and verse throughout the specification, it's the only type of registration server that was described in the specification and in the prosecution history. This is a summary judgment case where they provided no evidence, no evidence of any content. Their expert came forward with no evidence to present to Judge Friedman because he hadn't even looked at it one way or the other. So regardless of what the definition of content was, they had no evidence to support their claim that the university infringed this patent. Had no evidence at all. And for that reason alone, this motion for summary judgment should be affirmed. Any further questions? Thank you. Thank you, Mr. Carter. Mr. DeNovo. So I'd like to address Mr. Carter's final point first, since I have limited time. Mr. Carter indicated that we presented no evidence of any type that we had reviewed the architecture of the University of Phoenix to ascertain whether there was content managed by the architecture present on their registration servers. I would point the court, if I could, to the expert report of Dr. Stubblebine, A. 1830 to 44 through 45, where he describes having gone through the ApplyWeb registration server, the ApplyWeb database, and concluded, after looking at all the technical documentation, that there was no content managed by the architecture. And again, in his expert report, where he went through and looked where the content managed by the architecture was housed, and identified those specifically in the University of Phoenix's architecture. I believe that Mr. Carter is referring to a deposition question in which Mr. Stubblebine was asked, out of context, some hundreds of pages were provided to him and asked, is this content managed by the architecture? There was no statement as to where that information was located or from where it was derived. And Dr. Stubblebine stated that he hadn't reviewed those pages to that extent. So he was basically provided this information out of context, but his expert report details that he did through thorough analysis of the architecture based on the documentation provided by the University of Phoenix. Final point, the crux of the teaching is that the content managed by the architecture must be commercial in nature. It's set forth at the beginning of the summary of invention, and it is our contention that the district court failed to appreciate that when issuing its summary judgment. Thank you. Thank you. That concludes our morning. All rise. Our report is adjourned for tomorrow morning at 10 o'clock a.m.